IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| MATTHEW LIPSCOMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 26-11060 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | |
| | ) | **VERIFIED COMPLAINT** |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

COMES NOW the Plaintiff, Matthew Lipscomb, and avers the following:

## INTRODUCTION

1.      This is a civil rights action brought by Matthew Lipscomb ("Lipscomb") against the City of Detroit, Michigan ("Detroit") challenging the constitutionality of Detroit Ordinance § 31-14-1 *et seq*. "*Offenses at Healthcare Facilities*." Section 31-14-3 of the ordinance creates a floating personal "bubble zone" that prohibits an individual from approaching another person for the purpose of communicating within eight (8) feet of such person inside a radius of one hundred (100) feet of any entrance door of a healthcare facility, including an abortion clinic,

1

without first obtaining that person's consent. Section 31-14-4 establishes a "buffer zone" that prohibits an individual from engaging in speech in space extending fifteen (15) feet from any entrance to a healthcare facility, including an abortion clinic.

2. Section 31-14-1 *et seq.* either eliminates or severely restricts every communicative method Lipscomb could use to share his life-affirming beliefs to individuals on public sidewalks and ways near abortion clinics in the City of Detroit.

3. Pursuant to 42 U.S.C. §§ 1983 and 1988, Lipscomb seeks injunctive relief, declaratory relief, and nominal damages against Detroit.

4. The claims in this action concern Lipscomb's fundamental rights to free speech, due process, and free exercise of religion, as recognized in the First and Fourteenth Amendments to the United States Constitution.

5. Section 31-14-1 *et seq.* on its face and as applied to Lipscomb have deprived him and will continue to deprive him of his constitutional freedoms.

6. Each and every act alleged herein was committed under the color of state law and authority.

## JURISDICTION AND VENUE

7. This action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

8. Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has jurisdiction over Lipscomb's claims for injunctive relief and nominal damages. Per 28 U.S.C.

2

§§ 2201 and 2202, this Court has jurisdiction over Lipscomb's request for declaratory relief. And under 42 U.S.C. § 1988, this Court has jurisdiction over Lipscomb's claims for costs and attorney fees.

9. Venue is proper in the Eastern District of Michigan because all claims arise out of this district and the defendant resides in this district.

## PLAINTIFF

10. Lipscomb is resident of Brighton, Michigan.

## DEFENDANT

11. Detroit is a municipal governmental authority in the State of Michigan and has the authority to enact ordinances.

## STATEMENT OF FACTS

### *Lipscomb's Religious, Anti-Abortion Expression*

12. Lipscomb is a Christian who believes God creates human life in His image and likeness, beginning with fertilization in the mother's womb, and that all innocent human life is precious and deserving of a chance to live.

13. For this reason, Lipscomb believes the abortion procedure wrongly terminates innocent human life and is harmful to mothers.

14. Moved by religious conviction, Lipscomb shares his views about abortion with others and offers them information about alternatives for the abortion procedure.

3

15.     Lipscomb seeks to reach as many people as possible with his beliefs about abortion, especially women and those who accompany them on their visits to abortion clinics.

16.     Lipscomb wants to share the love of Jesus Christ with these individuals, advise of the harm abortion causes children and women, encourage those considering abortion to not fear the future, to see children as a blessing, and to implore them to choose life over death.

17.     In delivering his life-affirming message, Lipscomb offers tangible aid to women considering an abortion, supplying them with resources about how they can keep their children or put them up for adoption.

18.     To render this message, Lipscomb goes to public sidewalks and ways bordering abortion clinic properties.

19.     To help communicate his message, Lipscomb uses a whiteboard with hand-written notations that encourage women not to abort their children, apprise them of resources that would help them keep their children or put their children up for adoption, and inform them how to reverse the effects of the abortion pill.

20.     Lipscomb's whiteboard also invites discussion on these matters or the topic of abortion generally.  He seeks out opportunities to have close conversations with individuals about abortion, its impact, and viable alternatives.

21.     Lipscomb also hands out literature to individuals near abortion clinics.

22.     Lipscomb is part of an informal group of like-minded individuals who often join him on public ways and sidewalks adjacent to abortion clinics to impart their beliefs about abortion.  They call themselves Revival of Anti-Abortion Hope, or RAAH for short.

23.     Lipscomb particularly wants to share his message about abortion and alternatives on public sidewalks and ways contiguous to Scotsdale Women's Center ("Scotsdale") in Detroit.

### *Scotsdale and its Surroundings*

24.     Scotsdale markets itself as the leading abortion clinic in Detroit, offering surgical and medication abortions.

25.     Shelly Miller is the executive director for Scotsdale.

26.     The physical address for Scotsdale is 19305 W. Seven Mile Road, Detroit, Michigan, located at the corner of W. Seven Mile Road and Grandville Avenue.  Scotsdale property contains a clinic building, shrubbery beside the building, an inlet sidewalk, and a parking lot.



27.     The Scotsdale building faces W. Seven Mile Road with an enclosed portico out front.  Two doors from the portico allow entry into the building, one in the front on the north side and another door on the west side of the portico.  The building also has a back entrance.

28.     The parking lot for Scotsdale sits west of the clinic building.  A paved driveway extends from W. Seven Mile Road to the entry of the parking lot.  The driveway is on public property and intersects with the city sidewalk.



29.     A city sidewalk runs parallel with the clinic building approximately two to three feet in front of the building.  This public pathway enables pedestrian traffic to travel in both easterly and westerly directions. It is a major pedestrian thoroughfare and often used by individuals to get to various places located on W. Seven Mile Road.

30.     An inlet sidewalk is on Scotsdale's private property on the west side of the portico, extending from the city sidewalk to the west entrance of the building into the portico.

31.     Public grass spaces and an intersecting sidewalk sit north of the clinic building, lying between the parallel city sidewalk and W. Seven Mile Road.

32.      Aside from Scotsdale's parking lot, individuals visiting the abortion clinic park on the side of W. Seven Mile Road or Grandville Avenue near clinic property.



33.      From whatever parking space visitors choose to place their vehicles, anyone going to the abortion clinic must enter through one of the portico doors located at the front of the clinic building.

34.      Scotsdale has security guards who post near the clinic building and volunteer escorts who hover on clinic grounds and adjacent public property.

35.  The volunteer escorts usually come out on Saturdays, often in pairs, and wear rainbow-colored vests and name tags.

36.  The role of the volunteer escorts is to retrieve clinic visitors from the parking lot or other places as they exit their vehicles and to act as a buffer between anti-abortion individuals and the visitors until they get the visitors inside the clinic building.  Security guards also help with escorting efforts.

***Lipscomb Engages in Religious, Anti-Abortion Expression Outside of Scotsdale***

37.  Lipscomb began sharing his anti-abortion beliefs at the Scotsdale abortion clinic sometime in the summer of 2024.  He had previously visited another abortion clinic in Detroit before coming to Scotsdale.

38.  He wanted to go to Scotsdale because he noticed there were not many other anti-abortion individuals attending that space at that time.

39.  Other like-minded individuals eventually joined Lipscomb's expressive activities at Scotsdale.

40.  Lipscomb started visiting the public spaces close to Scotsdale on a regular basis, often going at least once a week, usually Saturdays, staying there from approximately 8:30 a.m. to noon.

41.  Lipscomb initially enjoyed access to all the public areas outside of Scotsdale to convey his message.

42.      This freedom to be and speak on public property allowed Lipscomb to communicate with anyone close to the abortion clinic to share his life-affirming views.

43.      Lipscomb usually stood on the northern edge of the sidewalk or in the grassy area close to the corner of the driveway and parking lot on the west side of the property so he could conversationally address individuals as they left the parking lot and walked toward the clinic door on the west side of the portico.

44.      His proximity to clinic visitors was/is critical for his communication. From these public spots Lipscomb is close enough to visitors to engage them in friendly conversation in a conversational tone and hand out literature to them.

45.      Lipscomb was also able to approach and address individuals as they walked from W. Seven Mile Road or Grandville Avenue toward the abortion clinic building.

46.      Lipscomb was further able to convey his beliefs with companions of the women visiting the abortion clinic while they waited in their vehicles parked on W. Seven Mile Road or Grandville Avenue.  Scotsdale apparently precludes many companions from entering the abortion clinic.

47.      Additionally, Lipscomb could approach and share his anti-abortion views with pedestrians walking on the public sidewalk who were not planning to visit Scotsdale. A convenience store and a food truck are located immediately west

of the Scotsdale parking lot.  Other businesses are located west and east of the abortion clinic.  Pedestrians frequently walk by Scotsdale on the public sidewalk to go to some other place.

48.     The volunteer escorts and security guards regularly tried to interfere with Lipscomb and others from communicating their views about abortion to clinic patrons.  They walked up to the visitors and placed themselves between Lipscomb and the visitors. As they walked beside them, the escorts and guards constantly talked to them to distract attention from Lipscomb and to vilify him.

49.     Nevertheless, Lipscomb was able to effectively communicate with clinic visitors coming from the parking lot because he could position himself on the public sidewalk or close to it.  From the places where he could stand and speak, the patrons could take his literature, and if inclined, have a conversation with him. Lipscomb was also able to walk around the escorts if needed to convey his message.

50.     Moreover, Lipscomb was able to reach visitors who did not park in the parking lot by approaching them as they exited their cars and walked toward the clinic entrance.

51.     Volunteer escorts and other Scotsdale agents also tried to intimidate Lipscomb and other individuals expressing anti-abortion views near clinic property. They forbid patrons from taking the literature into the clinic.  They took pictures of

Lipscomb and others and their license plates, kept dossiers on them, and put them in a binder.

52.     Security guards at Scotsdale warned Lipscomb to stay away from visitors and at times were verbally hostile toward him.  On one occasion, a security guard tried to knock literature out of his hands.

53.     But none of Scotsdale's efforts deterred Lipscomb from going there and sharing his message.  He was able to effectively communicate with his intended audience as long as Detroit police did not interfere with his speech.

### Detroit Passes Ordinance Designed to Curb Anti-Abortion Expression on Public Sidewalks and Ways Near Abortion Clinics

54.     Not long after Lipscomb began expressing his abortion beliefs with individuals visiting Scotsdale, Shelly Miller, the executive director for Scotsdale, contacted Detroit City Council, specifically, Council Member Gabriela Santiago-Romero, requesting help with the anti-abortion expressive activity that was occurring outside the abortion clinic.

55.     In response, Santiago-Romero asked the Detroit Law Department to prepare an ordinance to curb anti-abortion expression outside of abortion clinics. The local chapter of the National Lawyers Guild, a progressive bar association dedicated to social justice, helped the law department in drafting the ordinance.

56.     Following this effort, on August 20, 2024, Adam Saxby, Senior Assistant Corporate Counsel with the Detroit Law Department, submitted the draft

12

ordinance to the Detroit City Council amending Chapter 31 of the 2019 Detroit City Code, *Offenses*, by adding Article XIV, *Offenses at Healthcare Facilities*, to advance the City's interest in protecting the right of individuals to seek medical treatment and advice free from harassment and obstruction.

57.     The proposed ordinance is designed to bar unsolicited discussions about abortion outside abortion clinics.  It creates a 15-foot buffer zone around entrances of healthcare facilities and an 8-foot bubble zone extending 100 feet from entrance doors of healthcare facilities.

58.     On September 9, 2024, Detroit City Council's Public Health and Safety Standing Committee, chaired by Santiago-Romero, took the ordinance under advisement.

59.     At the outset of this meeting, during the time set aside for public comments, Sara Habbo, President of Detroit and Michigan chapters of the National Lawyers Guild and co-drafter of the ordinance, spoke in favor of the ordinance before it was even presented.  She informed that she and a fellow board member of National Lawyers Guild, Emma Howland-Bolton, worked on the buffer and bubble zone ordinance along with "reproductive justice partners" to ensure that patients, providers, volunteers, and community members can be safe in Detroit.  Her remarks centered on the presence of "protesters" and their use of "inaccurate" signs around

abortion clinics.  She also claimed violence and picketing around abortion clinics had increased nationwide.

60.     Later in the meeting Santiago-Romero introduced the proposed ordinance advancing buffer and bubble zones.  A motion to discuss the ordinance was approved.

61.     Santiago-Romero confirmed the ordinance was being shepherded through her office. She said she was presenting the ordinance to City Council because the "public" approached her office to expand the rights of abortion clinics.

62.     Santiago-Romero invited Adam Saxby, whom she identified as the author of the ordinance, to speak about it.

63.     Saxby offered his belief that the ordinance is legal and that it mirrors laws upheld by federal courts. He did not expound on the purpose for the ordinance or the City's interest in having buffer or bubble zones around abortion clinics.

64.     Santiago-Romero commented on the ordinance, saying members of the public wish to have a buffer so individuals visiting clinics could do so in a safe way. She asked that the ordinance be moved to formal session for a public hearing.  The other two members on the committee agreed with this proposal.

65.     A little over one week later, on September 17, 2024, Santiago-Romero introduced the proposed legislation for further consideration in formal session.

66.      During the initial public comment section, Shelly Miller voiced her support for the ordinance, labelling it a "clinic protection ordinance."   She complained about individuals like Lipscomb being in close proximity to the abortion clinic.

67.      Habbo spoke again in support of the ordinance, reiterating her concerns about protesters outside of abortion clinics and her work in tandem with "reproduction justice partners" to help draft the proposed ordinance designed to regulate "protester" activity.

68.      The following Saturday, September 28, 2024, Santiago-Romero visited the Scotsdale abortion clinic about the ordinance.

69.      Upon information and belief, Lipscomb addressed Santiago-Romero as she walked on the public sidewalk toward the abortion clinic that day.   Not recognizing her, presuming she was going to the clinic for an abortion or a consultation for one, Lipscomb encouraged her to not go forward with an abortion and offered to help her.   Santiago-Romero ignored the plea and walked into the building.

70.      While at the abortion clinic, Santiago-Romero obtained a binder from Shelly Miller containing identities, photographs, and personal information about anti-abortion individuals who shared their beliefs on the public ways outside of Scotsdale.

15

71.     A couple of days later, on September 30, 2024, the Public Health and Safety Standing Committee held a public hearing to consider the proposed ordinance.

72.     The meeting began with public comments on any topic.  During this portion of the meeting, Howland-Bolton with National Lawyers Guild, and co-drafter of the ordinance, called into the meeting and depicted the ordinance as akin to one upheld as constitutional by the U.S. Supreme Court in *Hill v. Colorado*.

73.     Habbo, Howland-Bolton's colleague at National Lawyers Guild and co-drafter of the ordinance, spoke next.  She similarly compared the ordinance to the one in the *Hill v. Colorado* case, specifically referencing the bubble zone restriction.

74.     Following Habbo's comments, Shelly Miller called to advocate for the ordinance once more.  She asserted that the "clinic protection ordinance" is needed to keep "protesters" from running up to patients and going to cars, depicting their expressive activity as harassment and intimidation.

75.     Subsequently, Santiago-Romero called the public hearing on the proposed ordinance to order, initially recognizing Saxby of the Detroit Law Department.

76.     Similar to prior comments, Saxby heralded the proposed ordinance as constitutional.

77.     Santiago-Romero described the proposed ordinance as a "simple ordinance" and opened the meeting to more public comments about the propriety of the measure.  During which time, many individuals in the community offered their thoughts on it, speaking both in favor and against the ordinance.

78.     All of the public comments concerned activities occurring outside abortion clinics, no other healthcare facilities were contemplated.

79.     Many individuals self-identifying as "sidewalk counselors" outside of Scotsdale and other abortion clinics spoke against the proposed ordinance.  They refuted the idea that they harass visitors, saying they engage in friendly conversations and offer help to people instead.

80.     Public comments lasted a little over one hour.  After which time, Santiago-Romero spoke in favor of the ordinance.  She indicated that buffer and bubble zones are needed to cut off unsolicited conversations about abortion outside of abortion clinics.  Pushing back on the notion that anti-abortion speakers are peaceful and safe, she equated their conversations to harassment.

81.     To purportedly substantiate and illustrate this point, Santiago-Romero referenced her encounter with Lipscomb a couple of days earlier.   She said that while she was walking to the entrance door of Scotsdale, she encountered a "white man in his early twenties," a description that fits Lipscomb, who addressed her and said he was there to save her baby and pleaded with her to not kill her baby.

82.     These remarks, according to Santiago-Romero, caused her to go "numb," that she "couldn't say anything," feeling "overwhelmed" in that moment. She considered the comments "inappropriate."

83.     Santiago-Romero also mentioned the binder she received from Scotsdale, observing that it is full of instances and people, some from other states, as reflected by the photographs of license plates, advising women about "what to do with their bodies."  She claimed, without elaborating, that not all conversations from these individuals are peaceful and that the buffer space was needed for people to obtain services from the abortion clinic.

84.     Santiago-Romero asked the committee to approve the ordinance and send it to new business at formal session of the City Council, calling the ordinance uncomplicated, simple, and necessary to create space for patrons of abortion clinics so they can access the services they need.

85.     The committee sent the proposed ordinance to formal session with a recommendation to approve the measure.

86.     The Detroit City Council had formal session the next day, October 1, 2024. It started with public comments, for and against the ordinance, again all pertaining to activity taking place outside of abortion clinics.

87.     Habbo came to the meeting in person to reassert her opinion that the ordinance is constitutional under the legal authority of *Hill v. Colorado*.  Several

members of the community countered that the Supreme Court condemned speech zones and severely undermined the authority of *Hill* in more recent cases.

88. Various speakers spoke against the ordinance because it targets peaceful communications, not threats or conduct. Some pointed out how the activity outside of abortion clinics that Santiago-Romero condemns as "inappropriate" is actually pure speech.

89. A couple of speakers described the anti-abortion expression at abortion clinics as religious diatribe intended to harass and intimidate clinic visitors. Other speakers refuted this characterization, noting the existence of current laws criminalizing harassment and that the City had never charged anyone at an abortion clinic with harassment.

90. The Executive Director of Guadalupe Workers, a local religious nonprofit group devoted to defending the mother and her child, explained that they go to public ways outside abortion clinics to help women experiencing unplanned pregnancies, not harass them, and have helped thousands of women with housing, vehicles, clothing and food so they can keep their babies.

91. Others raised concerns about the ban on close interactions with people, emphasizing that proximity matters, and that they need close, personal conversations with individuals considering an abortion to effectively communicate their message.

19

92. Monica Miller, a Detroit native and anti-abortion sidewalk counselor, said the proposed buffer and bubble zones would eliminate "real human interaction." She reasoned: "We approach the moms. We accompany them. We talk to them. We show them love and compassion and give them real material help so that they can turn from their decision to abort their children."

93. Some other speakers focused on the arbitrariness of the ordinance and the inherent difficulty with enforcing the ordinance.

94. Several speakers voiced concerns about the binder Santiago-Romero obtained from Scotsdale abortion clinic that contains dossiers on anti-abortion individuals.

95. Santiago-Romero admitted to having a binder full of people that Scotsdale employees identified as individuals who purportedly harass people outside Scotsdale. She had no qualms about the clinic creating the binder or her possessing it, requesting every member of City Council review it.

96. Miller, the executive director at Scotsdale, spoke and confirmed that they do maintain a binder identifying individuals who engage in expressive activity outside the abortion clinic and that she provided this binder to Santiago-Romero.

97. Public comments went on for over an hour and a half.

98. After receiving the comments, Santiago-Romero asked Saxby if he could address whether the ordinance infringes on rights, reiterating her belief that

20

the ordinance is "fairly simple."  He opined in the negative, describing the 15-foot buffer zone as a "static zone" that regulates expressive activities, "such as displaying certain signs, congregating, and picketing."  He portrayed the 8-foot bubble zone within 100 feet of any entrance to a clinic as a "dynamic zone" that restricts expressive activities within eight feet of a person, including leafletting.  He repeated his legal opinion that both zones are constitutional.

99.	In response to a question from a council member, Saxby said the ordinance was specifically modeled after *Hill v. Colorado*. He did not indicate whether Scotsdale or any other healthcare facility in Detroit had encountered same or similar concerns supporting the legislation upheld in *Hill*.  Nor did he explain why Detroit included a buffer zone that is not part of the ordinance in *Hill*.

100.	Saxby did not link the fifteen-foot buffer zone of § 31-14-4 to any legal authority.

101.	Neither Saxby, nor Santiago-Romero, nor anyone else provided any evidential support for §31-14-1 *et seq*.  There was no mention of any physical altercations, criminal harassment, or any other criminal activity occurring outside of abortion clinics.

102.	No one provided any evidence or suggestion that the City attempted to address concerns outside of healthcare facilities by means that restrict less speech.

103. Responding to a question about enforcement of the ordinance, Saxby said there was no specific requirement for notifying would-be speakers outside the clinics.

104. Interjecting about enforcement, Santiago-Romero assured the City Council that her office was communicating with the abortion clinics and that the clinics were already measuring from their entrances and putting out markers. She added that the clinics were eager for the ordinance to pass so they could set up buffer spaces. Santiago-Romero saw no problem with the clinics enforcing the buffer zones.

105. Speaking in favor of the ordinance, another council member clarified that the City Council did not "conjure up" the ordinance, confirming that the ordinance was brought about due to a request from a constituent in the Detroit community (namely, Scotsdale).

106. Santiago-Romero wrapped up her argument in favor of the ordinance emphasizing that the National Lawyers Guild and Detroit Law Department, the drafters of the ordinance, believe the ordinance is legal.

107. Santiago-Romero depicted communication from anti-abortion individuals asking women to reconsider an abortion as harassment, recounting how it was "very traumatic" for her to hear a white male saying please don't kill your baby. Despite not being pregnant, she found the experience "all incredibly

22

overwhelming and inappropriate during the time when someone might be going in there for different type of service."   She then moved for final reading of the ordinance and approval.

108.     The motion carried with the Detroit City Council adopting § 31-14-1 *et seq*. "*Offenses at Healthcare Facilities*."

109.     Section 31-14-1 *et seq*., titled "*Offenses at Healthcare Facilities*," was approved on October 10, 2024, and the ordinance became effective on October 22, 2024.

110.     The ordinance reads in pertinent part:

**Sec. 31-14-1.  Purpose.**

The City recognizes that access to healthcare facilities for the purpose of obtaining medical counseling and treatment is important for residents and visitors to the City.  The City also recognizes that the exercise of person's right to protest or counsel for or against certain medical procedures is a First Amendment activity that must be balanced against another person's right to obtain medical counseling and treatment in an unobstructed manner.  The City finds that the limited, viewpoint neutral, buffer and bubble zones outside of healthcare facilities established by this article will ensure that patients have unimpeded access to medical services while ensuring that the First Amendment rights of demonstrators to communicate their message to their intended audience is not impaired.

**Sec. 31-14-2.  Definitions.**

For the purposes of this article, the following words and phrases shall have the meaning respectively ascribed to them by this section:
*Healthcare facility* means a hospital, or medical clinic or office, or any combination of the two.
*Hospital* means a facility primarily engaged in providing by, or under, the supervision of physicians, medical services that include inpatient acute care services to disabled, injured, or sick persons.

*Medical clinic or office* means an establishment providing therapeutic, preventative, corrective, healing, and health-building treatment services on an outpatient basis by physicians, dentists, and other practitioners.

**Sec. 31-14-3. Eight-foot personal bubble zone.**

No person, within a 100-foot radius of any entrance door to a healthcare facility, shall knowingly approach within eight feet of another person for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public right-of-way unless such other person consents.

**Sec. 31-14-4.  Fifteen-foot buffer zone.**

(a)  No person or persons shall knowingly congregate, patrol, picket or demonstrate within a 15-foot radius of any entrance to the healthcare facility.
(b) This section shall not apply to the following:
(1)  Police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official duties; or
(2)  Authorized security, personnel, employees, or agents of the hospital, or medical clinic or office, engaged in assisting patients and other persons to enter or exit the hospital, or medical clinic or office.

111.      Violation of this ordinance constitutes a misdemeanor.

### *Adverse Impact of § 31-14-1 et seq. on Lipscomb's Expression*

112.      Section 31-14-4 does not permit Lipscomb to be within 15 feet of any entrance to Scotsdale abortion clinic at virtually any time.  Scotsdale qualifies as a healthcare facility and his expressive activity comes under this ordinance.  He "congregate(s)" in the public area since he is frequently joined by other people in his non-formal group.  He "patrol(s)" there because he constantly looks out for people coming to the abortion clinic.  And he "picket(s)" and "demonstrate(s)" in the space through his presence and signage.

24

113.	Consequently, Lipscomb is required to stay fifteen feet away from all entrances to Scotsdale. The entrances would at least include the doors of the enclosed portico of Scotsdale, the inlet sidewalk leading to the west door, and the driveway entrance to the parking lot.

114.	The buffer zone linked to these entrances engulfs a substantial portion of the public sidewalk and adjacent grassy areas that run parallel with the clinic building, shown as follows:



115.	Lipscomb was not aware of § 31-14-1 *et seq*. or the advent of buffer and bubble zones around Scotsdale when the ordinance first came into effect.  He had taken a break from his expressive activities that fall and early winter due to conflicts and inclement weather.

116.     Lipscomb came back to Scotsdale in January of 2025 and soon learned about the ordinance and its impact on his speech.

117.     Over the next several weeks, Scotsdale employees began marking the contours of the buffer zone with orange sticks, which boundary was enforced by Detroit police officers, as shown:



118.     Along with Scotsdale security guards, Detroit police officers warned Lipscomb to stay on other side of orange markers.

119.     The effect of the buffer zone is to push Lipscomb back approximately eight feet from spots where he can have conversations and hand out literature to individuals who park in the Scotsdale parking lot as they walk toward the clinic building.

120.     The forced repositioning creates an inflexible wedge between Lipscomb and his intended audience, significantly interfering with his efforts to communicate.

121.     Because the buffer zone does not allow for encroachment inside the space even if a visitor consents, Lipscomb is prevented from close social interaction he needs for effective communication.

122.     The distance as well as the ambient noise from W. Seven Mile Road causes Lipscomb to raise his voice significantly to speak with these visitors, undermining his winsomeness and purpose.  He has found that visitors do not react well to someone shouting at them.

123.     Visitors can possibly still see Lipscomb's sign, but the sign is not nearly as noticeable from beyond the buffer zone.  The distance affects the readability of the sign.

124.     The volunteer escorts and security guards at Scotsdale act as additional impediments to Lipscomb's messaging.  As they did before the ordinance, the clinic escorts and guards greet the visitors in the parking lot and purposefully walk

27

alongside them to drown out Lipscomb's speech and block view of his sign. Lipscomb can no longer work around them.

125.    While the buffer zone allows Lipscomb to converse or leaflet with individuals who park somewhere other than the parking lot, either on W. Seven Mile Road or Grandville Avenue, these individuals are but a small fraction of those visiting the abortion clinic.

126.    Also, any attempt of Lipscomb to reach individuals parking on the nearby streets falls squarely under the bubble zone restriction set out in § 31-14-3, which brings its own speech impediments.

127.    Due to the bubble zone restriction, Lipscomb cannot approach visitors who park on W. Seven Mile Road or Grandville Avenue.  He must stay 8 feet outside of an invisible bubble of every such person, unless he can first secure permission from the person to approach.  In that many people find it odd and off-putting to formally seek consent, and attempts to talk from 8 feet away, the floating bubble zone severely limits Lipscomb's ability to have conversations and hand out literature to clinic visitors.

128.    Exacerbating the communication difficulties associated with the bubble zone, Scotsdale puts out several signs in the public, grassy area near the sidewalk running alongside the building designed to discourage visitors from having conversations with Lipscomb and other like-minded individuals.  The signs falsely

28

label Lipscomb and others as "protesters," suggesting they are dangerous and can never come within 8 feet of visitors.

129.     Additionally, because the bubble zone applies to anyone within a 100-foot radius of Scotsdale entrance, the consent carve-out for the bubble zone is essentially negated by the presence of a volunteer escort who comes up to greet the visitor. Even if Lipscomb obtains consent from a clinic visitor, he could never secure consent from the nearby escort. Moreover, the accompanying bubble zone of the escort creates an even greater distance between Lipscomb and the person he wants to reach.

130.     Lipscomb could avoid some of the adverse effects of the bubble zone by standing near one of the entrances to Scotsdale abortion clinic, where he could hand out literature and prompt conversation to people as they approach and walk by him, but the buffer zone denies him this option.

131.     The 8-foot bubble zone further deters Lipscomb from approaching individuals who remain in their parked vehicles on the side of the public streets. Typically, with car windows closed, Lipscomb must yell from 8 feet away to seek consent to come closer to them.

132.     Further, the bubble zone inhibits Lipscomb from reaching out to pedestrians walking on the city sidewalk that have no intention to visit Scotsdale, but to go to the nearby food truck or some other business in the area. The 100-foot

radius spans public sidewalk on an entire block and on both sides of W. Seven Mile Road, as shown.



133.     Both ordinances, buffer zone (§ 31-4-4) and bubble zone (§ 31-4-3), serve to restrict Lipscomb's speech, individually and in conjunction with each other. The combined and complimentary impact of the two ordinances effectively censors Lipscomb from sharing his desired religious, anti-abortion message to his desired audience outside of Scotsdale abortion clinic.

*Lasting and Discriminatory Effect of § 31-4-1 et seq. on Lipscomb's Speech*

134.     Section 31-14-1 *et seq.* fosters an overarching barrier on Lipscomb's religious, anti-abortion expression on city-owned public sidewalks and ways.

135.     While the buffer and bubble zones wipe out Lipscomb's speech, clinic personnel and volunteer escorts are left free to share opposing viewpoints with visitors in the same areas.

136.     Section 31-4-4 (2) explicitly exempts agents of abortion clinics from the buffer zone.  They can be on public property within the buffer zones of the various entrances and communicate in any way they like.

137.     In addition to verbal comments directly opposing Lipscomb's messaging, Scotsdale agents are able to put out signs on public property where Lipscomb and others and others are forbidden from doing so.



138.    Scotsdale agents are further able to avoid application of the 8-foot bubble zone to them in public spaces due to the content not falling under the categories of "oral protest, education or counseling."

139.    Lipscomb's desire to communicate his religious, anti-abortion messaging on public sidewalk and ways outside of Scotsdale abortion clinic has not waned, but his communication is effectively stymied due to § 31-14-1 *et seq.* Compliance with the ordinances makes his speech largely ineffective while failing to comply subjects him to criminal sanction.

140. This fear of sanction and possible arrest severely limits Lipscomb's constitutionally protected expression on public sidewalks and ways near Scotsdale abortion clinic.

141. The impact of chilling and deterring Lipscomb from exercising his constitutional rights on public sidewalks and ways constitutes irreparable harm to him.

142. Lipscomb has no adequate remedy at law for the perpetual denial of his constitutional rights as caused by enforcement of the ordinance.

## FIRST CAUSE OF ACTION

### *Violation of Free Speech Clause*

143. Plaintiff's religious, anti-abortion expression constitutes protected speech under the First Amendment.

144. Section 31-14-1 *et seq.* on public ways:

    a. enforces overly broad restrictions on protected speech;

    b. singles out anti-abortion views for discriminatory censorship;

    c. restrains constitutionally-protected speech in advance of its expression, without appropriate guidelines or standards to guide the discretion of officials charged with enforcing the policy;

    d. chills the free speech and free exercise of religion of Lipscomb and third-party citizens;

33

      e.      restricts speech on basis of content and viewpoint; and

      f.      lacks narrow tailoring, fails to achieve any legitimate government purpose, and fails to leave open alternative avenues for expression.

145.      Defendant has no compelling or legitimate reason that can justify its restriction of religious and anti-abortion viewpoints that Lipscomb seeks to communicate on public sidewalks and ways in Detroit.

146.      Defendant has no compelling or legitimate reason that can justify enforcement of § 31-14-1 *et seq.*, to curb constitutionally protected viewpoints in traditional public fora.

147.      Section 31-14-1 *et seq.* and Defendant's application of it violate the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

WHEREFORE, Lipscomb respectfully prays the Court grant the equitable and legal relief set forth in his prayer for relief.

## SECOND CAUSE OF ACTION

### *Violation of Due Process Clause*

148.      Section 31-14-1 *et seq.* contains vague language and lacks objective standards needed to curtail the discretion of city officials. This gives Defendant

34

undue opportunity to enforce the ordinance in an *ad hoc*, arbitrary, and discriminatory manner.

149. Defendant has no compelling or legitimate reason that can justify the vague language of the ordinance.

150. Section 31-14-1 *et seq.* and Defendant's application of it violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Lipscomb respectfully prays the Court grant the equitable and legal relief set forth hereinafter in his prayer for relief.

**THIRD CAUSE OF ACTION**

***Violation of Free Exercise of Religion Clause***

151. Plaintiff maintains a sincere religious belief about abortion, believing the action to be morally wrong. He also maintains a religious conviction to share his beliefs about abortion with others.

152. Defendant is intolerant of Plaintiff carrying out his religious conviction in public ways.

153. Section 31-14-1 *et seq*. is not neutral and generally applicable in that it treats secular expression more favorably than religious expression.

154. Defendant's application of § 31-14-1 *et seq*. is hostile toward religion, denying Lipscomb and others like him of the ability to share religious beliefs in public ways.

35

155.     Defendant has no compelling or legitimate reason that can justify its hostility toward religion.

156.     Section 31-14-1 *et seq.* and Defendant's application of it violate the Free Exercise of Religion Clause of the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

WHEREFORE, Lipscomb respectfully prays the Court grant the equitable and legal relief set forth hereinafter in his prayer for relief.

**PRAYER FOR RELIEF**

WHEREFORE, Lipscomb respectfully prays for relief in that this Court:

A.     Assume jurisdiction over this action;

B.     Enter a judgment and decree declaring that § 31-14-1 *et seq.* is unconstitutional on its face and as applied to Lipscomb's desired expressive activity, violating the rights of Lipscomb and third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

C.     Enter a preliminary and permanent injunction enjoining Defendant Detroit, its agents, officials, servants, employees, and all persons in active concert or participation with it, or any of them, from applying § 31-14-1 *et seq.* to Lipscomb's religious and anti-abortion expression on public ways outside of Scotsdale abortion clinic;

D.     Enter a preliminary and permanent injunction enjoining Defendant,

their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from enforcing § 31-14-1 *et seq*. to restrict protected speech in traditional public fora;

E.      Adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment;

F.      That this Court award Lipscomb nominal damages for the violation of his constitutional rights;

G.      That this Court award Lipscomb his costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

H.      Grant such other and further relief as appears to this Court to be equitable and just.

Respectfully submitted,

s/Nathan W. Kellum                              s/ Jeff T. Schrameck
Nathan W. Kellum                                Jeff T. Schrameck
TN Bar No. 13482; MS Bar No.8813                MI Bar. No. P. 69523
First Liberty Institute                         Schrameck Law, P.L.L.C
699 Oakleaf Office Lane, Suite 107              843 Penniman Ave.
Memphis, TN  38117                              Plymouth, MI 48170
901-684-5485                                    734-454-5400
nkellum@firstliberty.org                        jeff@schramecklaw.com
Attorney for Plaintiff                          Attorney for Plaintiff

## VERIFICATION OF COMPLAINT

I, Matthew Lipscomb, a citizen of the United States and a resident of Brighton, Michigan, hereby declare that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged therein are true and correct.

_Matt Lipscomb_
MATTHEW LIPSCOMB